## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **CORY MYERS,** Individually and on behalf of all others similarly situated, | Case No. 4:24-cv-03955 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| **GRYPHON HEALTHCARE, LLC,** | |
| Defendant. | |

### CLASS ACTION COMPLAINT

Plaintiff Cory Myers ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Gryphon Healthcare, LLC ("Gryphon" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

### I.      INTRODUCTION

1.      Plaintiff brings this class action against Gryphon for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' personally identifiable information ("PII") and protected health information ("PHI"), including name, date of birth, address, Social Security number, dates of service, diagnosis information, medical treatment information, prescription information, provider information and medical record number (the "Private Information"), from criminal hackers.

1

2.      Gryphon, based in Houston, Texas, is a revenue cycle and management services company that serves healthcare service providing clients and their patients nationwide.

3.      On or about October 11, 2024, Gryphon filed an official notice of a hacking incident with the Office of the Maine Attorney General.[1] Under state and federal law, organizations must report breaches involving PHI within at least sixty (60) days.

4.      On or around the same time, Gryphon also sent out data breach letters (the "Notice") to individuals whose Private Information was compromised as a result of the hacking incident.

5.      Based on the Notice sent to Plaintiff and "Class Members" (defined below), Gryphon became aware on or around August 13, 2024 of a data security incident "involving a partner that Gryphon provides medical billing services for." In response, Defendant launched an investigation, which revealed that an unauthorized party had access to certain files that contained sensitive information belonging to its clients' patients (the "Data Breach").

6.      Plaintiff and "Class Members" (defined below) were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

7.      The Private Information compromised in the Data Breach contained highly sensitive data belonging to its clients' patients, representing a gold mine for data thieves. The data included, but is not limited to, Social Security number, dates of service, diagnosis information, medical treatment information, prescription information, provider information and medical record number that Gryphon collected and maintained.

---

[1] *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/07b59e7d-72e9-4bbe-abcb-dca588c27e65.html (last visited Oct. 16, 2024).

8.      Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns and insurance claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

9.      There has been no assurance offered by Gryphon that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

10.     Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11.     Plaintiff brings this class action lawsuit to address Gryphon's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

12.     The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Gryphon, and thus Gryphon was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

13.     Upon information and belief, Gryphon failed to properly monitor the computer network and systems that housed the Private Information. Had Gryphon properly monitored its networks, it would have discovered the Data Breach sooner.

14.     Plaintiff's and Class Members' identities are now at risk because of Gryphon's negligent conduct as the Private Information that Gryphon collected and maintained is now in the hands of data thieves and other unauthorized third parties.

15.     Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16.     Accordingly, Plaintiff, on behalf of himself and the Class, asserts claims for negligence, negligence *per se*, breach of third-party beneficiary contract, unjust enrichment, and declaratory judgment.

## II.      PARTIES

17.     Plaintiff Cory Myers is, and at all times mentioned herein was, an individual citizen of Santa Fe, Texas.

18.     Defendant Gryphon is a medical billing with its principal place of business at 4700 W. Sam Houston Parkway North, Suite 140, Houston, Texas 77041. The registered agent for service of process is Cogency Global Inc., 1601 Elm St., Suite 4360, Dallas, Texas 75201.

## III.      JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Gryphon. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20.     This Court has personal jurisdiction over Gryphon because Gryphon's principal place of business is located in the Houston Division of the Southern District of Texas, operates in and/or was organized under the laws of the State of Texas.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in the Houston Division of the Southern District of Texas and Gryphon has harmed Class Members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A. Gryphon's Business and Collection of Plaintiff's and Class Members' Private Information

22.     Gryphon is a medical billing company that provides coding and compliance, revenue cycle management, and consulting services to healthcare organizations throughout the United States, serving hundreds of thousands of those healthcare organizations' patients.

23.     As a condition of receiving medical billing services, Gryphon requires that its clients entrust it with highly sensitive personal and health information belonging to their patients. In the ordinary course of receiving service from Gryphon, Plaintiff and Class Members were thus required to provide their Private Information to Defendant.

24.     Thus, due to the highly sensitive and personal nature of the information Gryphon acquires and stores with respect to its clients' patients, Gryphon, upon information and belief, promises to, among other things: keep its clients' patients' Private Information private; comply with industry standards related to data security and the maintenance of its clients' patients' Private Information; inform its clients' patients of its legal duties relating to data security and comply with all federal and state laws protecting its clients' patients' Private Information; only use and release its clients' patients' Private Information for reasons that relate to the services it provides; and

provide adequate notice to its clients' patients if their Private Information is disclosed without authorization.

25.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Gryphon assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

26.     Plaintiff and Class Members relied on Gryphon to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

### B.  *The Data Breach and Defendant's Inadequate Notice to Plaintiff and Class Members*

27.     According to Defendant's Notice, it learned of unauthorized access to the Private Information on or around August 13, 2024, with such unauthorized access having begun on an undisclosed date.

28.     Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including Social Security number, dates of service, diagnosis information, medical treatment information, prescription information, provider information and medical record number.

29.     On or about October 11, 2024, roughly two months after Gryphon learned that the Class's Private Information was first accessed by cybercriminals, Gryphon finally began to notify its clients patients that its investigation determined that their Private Information was affected.

30.     Gryphon had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

31.     Plaintiff and Class Members provided their Private Information to Gryphon with the reasonable expectation and mutual understanding that Gryphon would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

32.     Gryphon's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

33.     Gryphon knew or should have known that its electronic records would be targeted by cybercriminals.

### C.   The Healthcare Sector is Particularly Susceptible to Data Breaches

34.     Gryphon was on notice that companies in the healthcare industry are susceptible targets for data breaches.

35.     Gryphon was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[2]

36.     The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that

---

[2] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited on Oct. 16, 2024).

cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[3]

37.     The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[4] In 2022, the largest growth in compromises occurred in the healthcare sector.[5]

38.     Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[6]

39.     Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[7]

---

[3] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n. (Oct. 4, 2019), *available at*: https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (last visited on Oct. 16, 2024).

[4] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last visited on Oct. 16, 2024).

[5] Identity Theft Resource Center, *2022 End-of-Yeare Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited on Oct. 16, 2024).

[6] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited on Oct. 16, 2024).

[7] *Id.*

40.     Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[8]

41.     As a healthcare servicer, Gryphon knew, or should have known, the importance of safeguarding its clients' patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on Gryphon's clients' patients as a result of a breach. Gryphon failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### D.  Gryphon Failed to Comply with HIPAA

42.     Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

43.     Gryphon's Data Breach resulted from a combination of insufficiencies that indicate Gryphon failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Gryphon's Data Breach that Gryphon either failed to

---

[8] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited on Oct. 16, 2024).

implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

44.     Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by CFR § 160.103.

45.     45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

46.     45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

47.     Plaintiff's and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

48.     Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

49.     Based upon Defendant's Notice to Plaintiff and Class Members, Gryphon reasonably believes that Plaintiff's and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

50.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

51.     Gryphon reasonably believes that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR,

Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

52.     Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

53.     Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

54.     Gryphon reasonably believes that Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

55.     It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

56.     It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

57.     After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future

harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

58. In addition, Gryphon's Data Breach could have been prevented if Gryphon had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its clients' patients.

59. Gryphon's security failures also include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Gryphon creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.   Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.   Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

k.   Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

60.     Because Gryphon has failed to comply with HIPAA, while monetary relief may cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure Gryphon's approach to information security is adequate and appropriate going forward. Gryphon still maintains the PHI and other highly sensitive PII of its current and former clients' patients, including Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

### E.  Gryphon Failed to Comply with FTC Guidelines

61.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in

violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

62.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

63.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

64.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

65.     As evidenced by the Data Breach, Gryphon failed to properly implement basic data security practices. Gryphon's failure to employ reasonable and appropriate measures to protect

against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an

unfair act or practice prohibited by Section 5 of the FTCA.

66.    Gryphon was at all times fully aware of its obligation to protect the Private

Information of its clients' patients yet failed to comply with such obligations. Defendant was also

aware of the significant repercussions that would result from its failure to do so.

### F.  Gryphon Failed to Comply with Industry Standards

67.    As noted above, experts studying cybersecurity routinely identify businesses as

being particularly vulnerable to cyberattacks because of the value of the Private Information which

they collect and maintain.

68.    Some industry best practices that should be implemented by businesses dealing

with sensitive PHI like Gryphon include but are not limited to: educating all employees, strong

password requirements, multilayer security including firewalls, anti-virus and anti-malware

software, encryption, multi-factor authentication, backing up data, and limiting which employees

can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or

all of these industry best practices.

69.    Other best cybersecurity practices that are standard in the industry include:

installing appropriate malware detection software; monitoring and limiting network ports;

protecting web browsers and email management systems; setting up network systems such as

firewalls, switches, and routers; monitoring and protecting physical security systems; and training

staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these

cybersecurity best practices.

70.    Upon information and belief, Defendant failed to implement industry-standard

cybersecurity measures, including by failing to meet the minimum standards of one or more of the

15

NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

71.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### G. Gryphon Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information

72.     In addition to its obligations under federal and state laws, Gryphon owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Gryphon owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

73.     Gryphon breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Gryphon's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.     Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b.   Failing to adequately protect its clients' patients' Private Information;

c.   Failing to properly monitor its own data security systems for existing intrusions;

d.   Failing to sufficiently train its employees regarding the proper handling of its clients' patients Private Information;

e.   Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f.   Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and

g.   Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

74.   Gryphon negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

75.   Had Gryphon remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

76.   Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Gryphon.

### H.  Gryphon Should Have Known that Cybercriminals Target PII and PHI to Carry Out Fraud and Identity Theft

77.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[9] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

78.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

79.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

---

[9] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Oct. 16, 2024).

80.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

81.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

82.     One such example of this is the development of "Fullz" packages.

83.     Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

84.     The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a

jury, to find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

85.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[10] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

86.      Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return or insurance claims using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

87.     PHI is also especially valuable to identity thieves.  As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[11]

---

[10] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited Oct. 16, 2024).
[11] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft (last visited on Oct. 16, 2024).

88.     Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

89.     While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[12]

90.     PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

91.     Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[13]

92.     The ramifications of Gryphon's failure to keep its clients' patients' Private Information secure are long lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

---

[12] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited on Oct. 16, 2024).

[13] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/ (last visited on Oct. 16, 2024).

93.     Here, not only was sensitive medical information compromised, but Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

94.     It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[14]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

95.     PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

96.     As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

---

[14] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html (last visited Oct. 16, 2024).

## I.  *Plaintiff's Experience.*

97.     Upon information and belief, Defendant obtained Plaintiff's Private Information in the course of conducting its regular business operations.

98.     At the time of the Data Breach, Defendant maintained Plaintiff's Private Information in its system.

99.     Plaintiff Myers is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

100.     Plaintiff Myers received the Notice Letter, by U.S. mail, directly from Defendant, dated October 11, 2024. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties, including his name, date of birth, address, Social Security number, dates of services, diagnosis information, health insurance information, medical treatment information, prescription information, provider information and medical record number.

101.     As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

102.     Plaintiff suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) uncompensated lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

103.     The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

104.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

105.     As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

106.     Plaintiff Myers has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.     CLASS ACTION ALLEGATIONS

24

107.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

108.    Specifically, Plaintiff proposes the following Nationwide Class definition, subject to amendment as appropriate:

> **Nationwide Class**
>
> All individuals in the United States who had Private Information accessed and/or acquired as a result of the Data Breach, including all who were sent a notice of the Data Breach.

109.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

110.    Plaintiff reserves the right to modify or amend the definitions of the proposed Nationwide Class, as well as add subclasses before the Court determines whether certification is appropriate.

111.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

112.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of 393,358 individuals who were patients of Gryphon's clients, and whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Gryphon's records, Class Members' records, publication notice, self-identification, and other means.

113.    Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Gryphon engaged in the conduct alleged herein;

    b.  Whether Gryphon's conduct violated the FTCA and HIPAA;

    c.  When Gryphon learned of the Data Breach

    d.  Whether Gryphon's response to the Data Breach was adequate;

    e.  Whether Gryphon unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

    f.  Whether Gryphon failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

    g.  Whether Gryphon's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    h.  Whether Gryphon's data security systems prior to and during the Data Breach were consistent with industry standards;

    i.  Whether Gryphon owed a duty to Class Members to safeguard their Private Information;

    j.  Whether Gryphon breached its duty to Class Members to safeguard their Private Information;

    k.  Whether hackers obtained Class Members' Private Information via the Data Breach;

l.  Whether Gryphon had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.  Whether Gryphon breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.  Whether Gryphon knew or should have known that its data security systems and monitoring processes were deficient;

o.  What damages Plaintiff and Class Members suffered as a result of Gryphon's misconduct;

p.  Whether Gryphon's conduct was negligent;

q.  Whether Gryphon's conduct was *per se* negligent;

r.  Whether Gryphon was unjustly enriched;

s.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

114.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Gryphon. Plaintiff are advancing the same claims and legal theories on behalf of himself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

115.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

116.  <u>Predominance</u>. Gryphon has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Gryphon's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

117.  <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Gryphon. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

118.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Gryphon has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

119.     Finally, all members of the proposed Class are readily ascertainable. Gryphon has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Gryphon.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

120.     Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

121.     Gryphon knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

122.     Gryphon knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Gryphon was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

123.     Gryphon owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Gryphon's duties included, but were not limited to, the following:

     a.  To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

     b.  To protect its clients' patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c.  To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d.  To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

e.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.  To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

124.    Gryphon's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

125.    Gryphon's duty also arose because Defendant was bound by industry standards to protect its clients' patients' confidential Private Information.

126.    Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Gryphon owed them a duty of care to not subject them to an unreasonable risk of harm.

127.    Gryphon, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Gryphon's possession.

128.    Gryphon, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

129.    Gryphon, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

130.    Gryphon breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.   Failing to adequately monitor the security of its networks and systems;

c.   Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d.   Allowing unauthorized access to Class Members' Private Information;

e.   Failing to comply with the FTCA and HIPAA;

131.    Gryphon had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Gryphon with their Private Information was predicated on the understanding that Gryphon would take adequate security precautions. Moreover, only Gryphon had the ability to protect its systems (and the Private Information that it stored on them) from attack.

132.    Gryphon's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and exfiltrated as alleged herein.

133.    As a result of Gryphon's ongoing failure to notify Plaintiff and Class Members regarding exactly what Private Information has been compromised, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

134.    Gryphon's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

135.    As a result of Gryphon's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

136.    Gryphon also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

137.    As a direct and proximate result of Gryphon's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

138.    The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

139.    Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

140.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Gryphon to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

### COUNT II
### NEGLIGENCE *PER SE*
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

141.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

142.     Pursuant to Section 5 of the FTCA, Gryphon had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

143.     Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Gryphon had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

144.     Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

145.     Gryphon breached its duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

146.     Specifically, Gryphon breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

147.     The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Gryphon's duty in this regard.

148.    Gryphon also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

149.    It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Gryphon's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

150.    Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and Gryphon's failure to comply with both constitutes negligence *per se*.

151.    Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Gryphon's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

152.    As a direct and proximate result of Gryphon's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the uncompensated lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

153.    As a direct and proximate result of Gryphon's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

154.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Gryphon to, *inter alia*, strengthen its data security systems and

monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT III
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
## (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

155.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

156.    Defendant entered into contracts, written or implied, with its healthcare entity clients to perform services that include, but are not limited to, providing revenue cycle and management services. Upon information and belief, these contracts are virtually identical between and among Defendant and its clients around the country whose patients, including Plaintiff and Class Members, were affected by the Data Breach.

157.    In exchange, Defendant agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

158.    These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its clients. Defendant knew that if it were to breach these contracts with its clients, the clients' patients—Plaintiff and Class Members—would be harmed.

159.    Defendant breached the contracts it entered into with its clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiff and Class Members thereof.

160.    Plaintiff and the Class were harmed by Defendant's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

161.    Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)**

162.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

163.    This count is brought in the alternative to Count III.

164.    Plaintiff and Class Members conferred a benefit on Gryphon by permitting their healthcare providers – Defendant's clients – to turn over their inherently valuable Private Information to Defendant.

165.    Defendant, in turn, enriched itself by saving the costs it should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

166.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

167.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members,

because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

168.    Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

169.    If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

170.    Plaintiff and Class Members have no adequate remedy at law.

171.    Due to Gryphon's conduct alleged herein, it would be unjust and inequitable under the circumstances for Gryphon to be permitted to retain the benefit of its wrongful conduct.

172.    As a direct and proximate result of Gryphon's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury, as alleged herein.

173.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Gryphon and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Gryphon from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

174.    Plaintiff and Class Members may not have an adequate remedy at law against Gryphon, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT V
### DECLARATORY JUDGMENT
### (ON BEHALF OF PLAINTIFF AND THE NATIONWIDE CLASS)

175.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

176.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this Complaint.

177.    Gryphon owes a duty of care to Plaintiff and Class Members, which required it to adequately secure Plaintiff's and Class Members' Private Information.

178.    Gryphon still possesses Private Information regarding Plaintiff and Class Members.

179.    Plaintiff allege that Gryphon's data security measures remain inadequate. Furthermore, Plaintiff continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

180.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Gryphon owes a legal duty to secure its clients' patients' Private Information and to timely notify customers of a data breach under the common law, HIPAA, and the FTCA;

b.  Gryphon's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect its clients' patients' Private Information; and

c.  Gryphon continues to breach this legal duty by failing to employ reasonable measures to secure its clients' patients' Private Information.

181.    This Court should also issue corresponding prospective injunctive relief requiring Gryphon to employ adequate security protocols consistent with legal and industry standards to protect its clients' patients' Private Information, including the following:

a.   Order Gryphon to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b.   Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Gryphon must implement and maintain reasonable security measures, including, but not limited to:

    i.    engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Gryphon's systems on a periodic basis, and ordering Gryphon to promptly correct any problems or issues detected by such third-party security auditors;

    ii.   engaging third-party security auditors and internal personnel to run automated security monitoring;

    iii.  auditing, testing, and training its security personnel regarding any new or modified procedures;

    iv.   segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Gryphon's systems;

    v.    conducting regular database scanning and security checks;

vi.      routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.     meaningfully educating its clients' patients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect himself.

182.    If an injunction is not issued, Plaintiff will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Gryphon. The risk of another such breach is real, immediate, and substantial. If another breach at Gryphon occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

183.    The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Gryphon if an injunction is issued. Plaintiff will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Gryphon's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Gryphon has a pre-existing legal obligation to employ such measures.

184.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Gryphon, thus preventing future injury to Plaintiff and other individuals whose Private Information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class described above, seeks the following relief:

a.  An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class requested herein;

b.  Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  An order instructing Gryphon to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e.  An order requiring Gryphon to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.


DATED: October 16, 2024.          Respectfully submitted,


*/s/ Joe Kendall*
JOE KENDALL
Texas Bar No. 11260700
SDTX Bar No. 30973
KENDALL LAW GROUP, PLLC

41

3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
214-744-3000
214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com

Gary M. Klinger*
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

*Pro Hac Vice application forthcoming

Attorneys for Plaintiff